**RODNEY S. DIGGS, ESQ. (SBN 274459)**
rdiggs@imwlaw.com
**IVIE McNEILL WYATT PURCELL & DIGGS**
A Professional Law Corporation
444 South Flower Street, Suite 3200
Los Angeles, California 90071
Telephone: (213) 489-0028
Facsimile: (213) 489-0552
*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM PEPPER, | Case No. **'26 CV 353   TWR SBC** |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | 1. **RACE DISCRIMINATION (TITLE VII)** |
| ALEJANDRO MAYORKAS, | 2. **SEX DISCRIMINATION - DISPARATE TREATMENT (TITLE VII)** |
| Secretary, | 3. **SEX DISCRIMINATION - HOSTILE WORK ENVIRONMENT (TITLE VII)** |
| U.S. Department of Homeland Security, | 4. **RETALIATION (TITLE VII)** |
| Defendant. | **JURY TRIAL DEMAND** |

Plaintiff Adam Pepper, by and through undersigned counsel, brings this action against Defendant Alejandro Mayorkas, Secretary of the U.S. Department of Homeland Security, seeking damages and other relief for unlawful employment discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, and alleges as follows:

1

## NATURE OF THE ACTION

1.    This is a civil action for employment discrimination, hostile work environment, disparate treatment, and unlawful retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Plaintiff, an African American male with twelve years of exemplary service as a Customs and Border Protection Officer, challenges his wrongful removal from federal employment on January 4, 2023, which was motivated by discrimination based on race and sex, and in retaliation for his prior protected Equal Employment Opportunity activity. Plaintiff seeks compensatory damages for the severe economic, professional, emotional, and reputational harm he has suffered as a result of Defendant's unlawful conduct.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action pursuant to 42 U.S.C. § 2000e-16(c), which provides a cause of action for discrimination in federal employment, and 28 U.S.C. §§ 1331 and 1346.

3.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(e) because Plaintiff resides in Harbor City, California within this district, the events giving rise to this action occurred at Los Angeles International Airport in this district, and Defendant maintains offices in this district.

### Exhaustion of Administrative Remedies

4.    Plaintiff has exhausted his administrative remedies as required by law.

5.    Plaintiff appealed his removal to the Merit Systems Protection Board (MSPB) on January 27, 2023, asserting claims of discrimination and retaliation.

6.    Following a hearing, Administrative Judge Michael S. Perry issued an Initial Decision on May 11, 2023, affirming Plaintiff's removal.

7.    Plaintiff timely filed a Petition for Review with the full MSPB Board.

8.    On November 17, 2025, the MSPB issued a Final Order denying

2

Plaintiff's Petition for Review and affirming his removal.

9.   According to the Certificate of Service attached to the MSPB Final Order, Plaintiff's then-attorneys Shane Robertson and Tyler Sroufe of the Devadoss Law Firm received electronic service of the Final Order on November 17, 2025.

10.   Attorney Robertson forwarded the MSPB Final Order to Plaintiff by email on November 25, 2025.

11.   Plaintiff contacted Robertson to discuss his options following the adverse decision.

12.   On December 5, 2025, Robertson spoke with Plaintiff by telephone and advised him that he should file a civil lawsuit in federal court, that the Devadoss Law Firm does not handle civil cases, and that Plaintiff had 60 days from the Final Order to file a civil action.

13.   Robertson told Plaintiff to search online for a civil attorney or alternatively to file an appeal with the EEOC Office of Federal Operations (OFO), which the Devadoss Law Firm could handle.

14.   On December 17, 2025, attorney Tyler Sroufe filed an OFO appeal on Plaintiff's behalf.

15.   The OFO appeal remains pending.

16.   Plaintiff never received any documents via certified mail, regular mail, or postmark from the MSPB during the administrative proceedings.

17.   This civil action is filed following Plaintiff's retention of new counsel.

**PARTIES**

18.   Plaintiff Adam Pepper is a 45-year-old African American male who resides in Harbor City, California.

19.   At all times relevant to this Complaint, Plaintiff was a federal employee employed by U.S. Customs and Border Protection (CBP), an agency within the Department of Homeland Security, in the position of Customs and Border Protection

Officer, GS-1895-12, stationed at Los Angeles International Airport.

20.    Defendant Alejandro Mayorkas is sued in his official capacity as Secretary of the U.S. Department of Homeland Security. The Secretary is responsible for the operation and administration of DHS and its component agencies, including CBP, and is the appropriate defendant for Title VII claims against the agency.

<b>FACTUAL ALLEGATIONS</b>

**A. Plaintiff's Exemplary Employment Record**

21.    Plaintiff was hired by CBP as a Customs and Border Protection Officer on June 20, 2011.

22.    For twelve years, Plaintiff served his country with distinction as a federal law enforcement officer at one of the nation's busiest international airports.

23.    Throughout his career, Plaintiff received:

- Passing performance evaluations rated at "Acceptable" or "Above Acceptable" levels of competence every single year of his employment, including during the years of the alleged misconduct charges;
- Individual Special Acts of Service Awards;
- Service Awards;
- Cash Awards for exceptional performance;
- Time-off Awards recognizing his contributions;
- Commendations from supervisors and colleagues; and
- Numerous expressions of confidence in his abilities.

24.    Plaintiff's official Electronic Official Personnel Folder (eOPF) maintained by CBP Headquarters documents these achievements and awards throughout his tenure from 2011 through 2023.

25.    Despite this exemplary record, the Agency removed Plaintiff based on three charges, only one of which—a four-day suspension that was pending

arbitration—constituted any prior disciplinary action.

26.     Plaintiff carried a firearm, exercised law enforcement authority, conducted passenger and cargo inspections, testified in legal proceedings, and was trusted with significant federal responsibilities throughout his entire career, including during and after the incidents the Agency later claimed rendered him unfit for service.

27.     The Agency's claim that Plaintiff could not be trusted to carry a firearm or testify in court is contradicted by the Agency's own actions in maintaining Plaintiff in his position, awarding him recognition, and rating his performance as acceptable or above for years after the alleged incidents.

**B. Prior Protected EEO Activity and Retaliation**

28.     In 2014, Plaintiff was suspended for three days for allegedly making a careless misstatement.

29.     Plaintiff filed an EEO complaint challenging the 2014 suspension as discriminatory (EEOC Case No. 480-2015-00783X), engaging in protected activity under Title VII.

30.     During the EEO investigation, CBP Section Chief Anthony Owens provided a written statement supporting Plaintiff's position regarding harassment, intimidation, and antagonism by another member of CBP management from 2013 to 2015.

31.     In June 2016, Plaintiff and the Agency entered into a formal settlement agreement resolving the EEO complaint.

32.     Under the settlement agreement, the Agency agreed to:
   o   Convert Plaintiff's three-day suspension to a letter of reprimand;
   o   Ensure the letter of reprimand would not be placed in Plaintiff's Official Personnel Folder;
   o   Pay Plaintiff back pay with interest; and

o   Other settlement terms.

33.   In exchange, Plaintiff agreed to withdraw his EEO complaint with prejudice.

34.   The settlement agreement contained confidentiality and non-disclosure provisions.

35.   Despite the settlement agreement, the Agency violated its terms by:

o   Retaining documents related to the 2014 suspension in Plaintiff's agency file;

o   Citing the 2014 "three-day suspension" as prior discipline in Acting Port Director Cheryl Davies' July 2020 proposal to suspend Plaintiff for 14 days;

o   Including the 2014 suspension documents in Tab 4 of the agency file designated as "All Documents Relevant and Material to this Appeal" in the current removal action; and

o   Relying upon discipline that was contractually extinguished through Plaintiff's protected EEO activity as an aggravating factor supporting removal.

36.   At the MSPB hearing, when questioned under oath about her knowledge of the 2014 discipline, Acting Port Director Cheryl Davies initially testified that she was completely unaware of any disciplinary action against Plaintiff from 2014.

37.   When confronted with her own July 2020 proposal letter that explicitly referenced Plaintiff's "three-day suspension" from 2014, Davies was forced to admit that she must have been aware of the 2014 suspension in 2020, but claimed she had somehow forgotten about it by the time she issued the December 2021 removal proposal.

38.   Davies' demonstrably false testimony under oath regarding her

6

knowledge of Plaintiff's prior EEO activity evidences consciousness of wrongdoing and retaliatory animus.

39.    The Agency's reliance on discipline that was challenged through protected EEO activity and nullified by settlement constitutes retaliation per se, converting Plaintiff's exercise of EEO rights into an aggravating factor for removal.

### C. Quid Pro Quo Sexual Harassment by Section Chief Anthony Owens

40.    Following the 2016 EEO settlement in which Section Chief Anthony Owens (Tony Owens) had provided a supporting statement for Plaintiff, Owens began sending Plaintiff inappropriate sexually-oriented text messages.

41.    From approximately September 19, 2017 through November 29, 2018, Owens sent Plaintiff numerous text messages of a sexual nature.

42.    In one message, Owens explicitly stated that Plaintiff "owed him a hug" as payment for the statement Owens had provided in support of Plaintiff's EEO case, constituting classic quid pro quo sexual harassment.

43.    Owens, as a Section Chief, was Plaintiff's superior in the CBP management hierarchy.

44.    The messages disturbed and distressed Plaintiff, who did not know what to do or who to talk to about receiving sexually inappropriate communications from a male Section Chief who managed him.

45.    Plaintiff fell into a depressive state for years as a result of the harassment.

46.    Plaintiff was afraid to report the harassment because he feared retaliation "again"—explicitly referencing his prior experience with retaliation from CBP management.

47.    Owens, demonstrating consciousness of guilt, sent messages begging Plaintiff to delete the text message exchanges because Owens knew his conduct was wrong and violated professional standards.

48.    Plaintiff stopped replying to Owens and ceased communication with him, but never formally reported the harassment due to fear of retaliation.

49.    Section Chief Anthony Owens retired from CBP in approximately 2019-2020.

50.    Plaintiff's fear of retaliation from CBP management for reporting sexual harassment was not paranoid or unfounded—it was based on his actual prior experience with agency retaliation following his 2014-2016 EEO complaint.

51.    The Agency created and maintained a work environment in which a senior manager could sexually harass a subordinate employee with impunity, and in which the subordinate reasonably feared that reporting the harassment would result in career-ending retaliation.

**D. Work-Related Injury and Prescribed CBD Treatment**

52.    On April 13, 2020, while off duty, Plaintiff was viciously attacked by a dog, sustaining severe injuries to his right leg.

53.    Plaintiff required surgery, skin grafts, and extensive physical therapy to treat the dog bite injuries.

54.    Despite surgery and physical therapy, Plaintiff's pain worsened and became unbearable.

55.    On April 28, 2021, Plaintiff consulted with Dr. Leia Rispoli at Skin and Laser Dermatology Center for ongoing right leg pain from the dog bite injury.

56.    Dr. Rispoli diagnosed superficial nerve injury with slow healing.

57.    Dr. Rispoli prescribed:

○    Voltaren gel (topical anti-inflammatory); and

○    Sunsoil CBD oil 1200 mg, to be taken 1-2 ml every 4-6 hours as needed for pain.

58.    CBD (cannabidiol) products containing less than 0.3% THC are classified as hemp and are federally legal under the 2018 Farm Bill.

59.    The Sunsoil CBD oil prescribed to Plaintiff by Dr. Rispoli was federally legal hemp containing less than 0.3% THC and was accompanied by certificates of analysis from three accredited laboratories confirming compliance with federal law.

60.    Plaintiff used the CBD oil exactly as prescribed by his physician to manage chronic pain from his injury.

61.    Plaintiff never used marijuana recreationally.

62.    Plaintiff never intended to consume any illegal substance.

63.    The Agency never provided Plaintiff with notice or warning that use of prescribed, federally legal CBD oil could result in a positive drug test for THC.

**E. The Three Charges Underlying Plaintiff's Removal**

*Charge 1: November 2020 Passenger Incident - Third-Party Complaint Based on False Information*

64.    On November 29, 2020, Plaintiff was working in the Admissibility Review Unit at LAX when he processed a passenger, L.Y., who was traveling from Singapore to Florida.

65.    L.Y. was traveling under the Visa Waiver Program and was visiting her boyfriend K.R.

66.    Plaintiff conducted a secondary inspection interview of L.Y. in accordance with CBP protocols.

67.    Plaintiff granted L.Y. the full 90-day stay in the United States—the maximum period allowed under the Visa Waiver Program.

68.    Plaintiff stamped L.Y.'s passport with the 90-day authorization, creating an official record of the admission period granted.

69.    After the inspection, K.R., L.Y.'s boyfriend (later husband), filed a complaint through CBP's Compliments and Complaints Branch.

70.    K.R. was not present during Plaintiff's interview of L.Y. and had no firsthand knowledge of what occurred during the secondary inspection.

9

71.    K.R.'s complaint was based on his mistaken belief that Plaintiff had given L.Y. a limited stay, when in fact Plaintiff had given her the full maximum 90 days.

72.    CBP's Joint Intake Center received the third-party complaint on December 4, 2020.

73.    In January 2021, Plaintiff provided a responsive statement denying any inappropriate conduct and maintaining he was professional with all passengers.

74.    At the MSPB hearing, the CBP employee who took K.R.'s complaint testified under oath that Plaintiff had indeed given L.Y. the full 90 days—the maximum time allowed—completely contradicting the basis of K.R.'s complaint.

75.    The passport stamp providing objective documentary proof that Plaintiff granted the full 90 days further established that K.R.'s complaint was factually baseless.

76.    L.Y. later married K.R. after entering the United States, changing her immigration status and rendering the Visa Waiver Program passport no longer applicable.

77.    The Agency took no disciplinary action regarding this third-party complaint for over two years, despite having evidence from the passport stamp and CBP records that the complaint was factually incorrect.

78.    During those two years, Plaintiff continued to perform his duties processing passengers, conducting inspections, carrying a firearm, and exercising law enforcement authority without any restriction, supervision, or additional incident.

79.    The Agency's failure to take any action on the factually baseless third-party complaint for two years demonstrates that management did not genuinely believe Plaintiff had engaged in any misconduct or posed any risk to passengers or the public.

80.   The complaint was resurrected only when the Agency sought to build a case for removal by aggregating multiple charges, despite the Agency's own evidence proving the complaint was without merit.

81.   The Agency's reliance on a third-party complaint by someone who was not present during the interaction, which was contradicted by the Agency's own records and testimony, demonstrates the pretextual nature of Plaintiff's removal.

### *Charge 2: April 2021 Airside Driving Incident*

82.   On April 16, 2021, Supervisory CBPO Paul Nguyen assigned Plaintiff and CBPO C.D. to escort a family being removed from the United States from the Admissibility Review Unit to Terminal 7 for their return flight.

83.   Plaintiff did not possess a current Restricted Area Driver (RAD) icon required to drive vehicles on the LAX airside.

84.   However, Plaintiff had driven CBP vehicles on the airside hundreds of times over the years without consequence, citation, or objection from management.

85.   Supervisor Nguyen gave Plaintiff what Plaintiff reasonably understood to be a direct order to drive the family to Terminal 7.

86.   Plaintiff complied with his supervisor's order and drove the CBP van with CBPO C.D. in the passenger seat.

87.   An aircraft pilot reported being cut off by a vehicle, which the pilot initially identified as a "TSA van," not a CBP vehicle.

88.   Los Angeles World Airports (LAWA) scheduled a hearing for April 27, 2021 to investigate the incident.

89.   The LAWA hearing invitation was sent to multiple CBP supervisors and managers, including Acting Port Director Cheryl Davies, requiring their attendance.

90.   Plaintiff attended the LAWA hearing via video conference.

91.   No CBP management personnel appeared at the LAWA hearing to represent or support Plaintiff, despite multiple supervisors and managers being

required to attend.

92.    Plaintiff was left to defend himself alone at the LAWA hearing without any agency representation or support.

93.    During the LAWA hearing, Plaintiff repeatedly asserted that he did not cut off any aircraft and that the identification was mistaken.

94.    At the MSPB hearing, CBPO C.D., who was in the passenger seat of the van during the incident, testified under oath that:

- He observed the aircraft to be parallel to the van, not crossing paths; and
- Plaintiff did not violate any safety policies.

95.    C.D.'s sworn testimony corroborated Plaintiff's account and contradicted the Agency's characterization of the incident.

96.    LAWA suspended Plaintiff's airside access for 30 days, and CBP placed him on administrative duty during that period.

97.    The Agency never disciplined Supervisor Nguyen for ordering Plaintiff to drive without a valid RAD icon, demonstrating disparate treatment.

98.    The Agency's failure to provide representation at the LAWA hearing, despite being required to attend, deprived Plaintiff of due process and demonstrates the Agency's discriminatory intent to manufacture grounds for removal.

99.    After the LAWA hearing concluded, the MSPB Administrative Judge improperly referred to the proceeding as a "LAWA meeting" rather than a "LAWA hearing" in an apparent attempt to minimize the due process implications of the Agency's abandonment of Plaintiff.

***Charge 3: August 2021 Drug Test***

100.    CBP has a mandatory random drug testing program for employees in testing-designated positions, including Customs and Border Protection Officers.

101.    On August 18, 2021, Plaintiff submitted to a mandatory random drug

12

test.

102.    On August 25, 2021, Medical Review Officer Dr. Naila Rahman contacted Plaintiff by telephone and informed him that his test was positive for marijuana/THC.

103.    Plaintiff immediately and truthfully explained to Dr. Rahman that:

    o    He had never used marijuana;

    o    He was prescribed CBD oil by his physician Dr. Rispoli for a severe injury; and

    o    He could provide pharmacy records and medical prescription documentation to explain the positive result.

104.    Plaintiff requested an opportunity to submit his prescription and medical records.

105.    Dr. Rahman did not offer Plaintiff split sample reconfirmation testing, which is standard mandatory procedure under federal drug testing regulations to ensure accuracy of positive results.

106.    Split sample testing allows the employee to have the second portion of the original specimen tested at a different laboratory to confirm or refute the initial positive result.

107.    Dr. Rahman did not inform Plaintiff that his prescription documentation would be insufficient or unacceptable before reporting the positive result to the Agency.

108.    Dr. Rahman did not provide Plaintiff the required 72 hours to request split sample testing before reporting results to the Agency.

109.    Dr. Rahman reported the positive test result to CBP on August 26, 2021—the very next day after first contacting Plaintiff—without allowing the standard procedural protections.

110.    The positive test result was caused by Plaintiff's long-term, consistent

13

use of legally prescribed CBD oil containing federally legal trace amounts of THC below the 0.3% threshold, not by marijuana use.

111. Following Dr. Rahman's report of the positive test, CBP immediately:

- o Removed Plaintiff from duty;
- o Confiscated his firearm and credentials;
- o Restricted his access to CBP facilities; and
- o Assigned him to administrative duties.

**F. Comparator Evidence: Similarly Situated Employees Treated More Favorably**

112. The Agency treated similarly situated employees who were not African American males substantially more favorably than Plaintiff for the same or more serious conduct.

*M.B. - Central American Female*

113. M.B. is a Central American female Customs and Border Protection Officer.

114. M.B. tested positive for drugs on a random drug test.

115. The Agency removed M.B. from her position based on the positive drug test.

116. However, M.B. was subsequently reinstated to her CBP position allegedly due to an "agency error" that was never disclosed or explained.

117. M.B. remains employed by CBP as a fully reinstated officer with all rights and privileges.

118. Unlike Plaintiff, M.B. was given a second chance and returned to duty despite testing positive for drugs.

*L.T. - Hispanic Female*

119. L.T. is a Hispanic female Customs and Border Protection Officer who was serving as an acting supervisor in August 2021.

14

120. L.T. tested positive for THC/marijuana on a random drug test in August 2021—the same month as Plaintiff's positive test.

121. L.T. testified under oath at the MSPB hearing that she tested positive and that the Agency knew about her positive result.

122. Like Plaintiff, L.T. provided prescription records to the Medical Review Officer to explain her positive result.

123. Unlike Plaintiff, the Medical Review Officer accepted L.T.'s prescription as a valid medical explanation.

124. Because the MRO accepted L.T.'s medical explanation, no positive result was formally reported to the Agency for disciplinary purposes.

125. L.T. was not disciplined in any way.

126. L.T. remains employed by CBP and continues to serve in supervisory capacities.

127. L.T. and Plaintiff were identically situated: both tested positive for THC in the same month, both had prescriptions, both provided medical explanations. The only difference was how the MRO and Agency chose to treat their cases.

***Supervisor Auccsion - Filipino Male***

128. Supervisor Auccsion is a Filipino male CBP supervisor.

129. Supervisor Auccsion tested positive for both methamphetamine and THC on a random drug screening—far more serious than Plaintiff's single positive for THC from prescribed CBD.

130. Rather than face disciplinary action or removal, Supervisor Auccsion was granted early retirement, allowing him to leave federal service with full benefits and without the stigma of removal for drug use.

131. The Agency's treatment of Supervisor Auccsion demonstrates that it had alternatives to removal even for more serious drug test violations, but chose not to extend those alternatives to Plaintiff.

15

*Disparate Treatment in Drug Testing Procedures*

132.   The Agency's own policies and federal regulations require Medical Review Officers to offer split sample testing to employees who test positive.

133.   Dr. Rahman offered and provided split sample testing procedures to other CBP employees, but not to Plaintiff.

134.   The Agency's failure to follow mandatory split sample testing procedures for Plaintiff while following them for other employees constitutes disparate treatment in the testing process itself.

## G. December 2021 Proposed Removal and Decision

135.   On December 22, 2021—more than two years after the November 2020 passenger complaint—Acting Port Director Cheryl Davies issued a Notice of Proposed Removal to Plaintiff based on three charges:

- o Charge 1: Unprofessional Conduct Towards a Member of the Public (November 2020 incident);
- o Charge 2: Careless Operation of a Government Vehicle (April 2021 incident); and
- o Charge 3: Testing Positive for a Controlled Substance in a Random Drug Test (August 2021).

136.   Plaintiff actually received the proposal on December 21, 2021.

137.   Director of Field Operations Carlos Martel was designated as the deciding official.

138.   Plaintiff submitted an oral reply on June 30, 2022, presenting mitigating evidence and explanations for each charge, including his prescribed CBD use for a work-related injury.

139.   During his testimony at the MSPB hearing, Martel stated that he lost confidence in Plaintiff's ability to carry a firearm and testify in court based on the positive drug test.

16

140. Martel made this statement despite knowing that:

- Plaintiff had carried a firearm for 12 years without incident;

- Plaintiff had testified in legal proceedings throughout his career;

- The positive test resulted from prescribed CBD, not illegal marijuana use;

- Plaintiff had received awards and acceptable performance ratings throughout his career; and

- The Agency itself had trusted Plaintiff with these responsibilities for a full year after the positive test while he was on administrative duty.

141. Martel further testified that he considered Plaintiff's consumption of prescribed CBD to be "equally as severe as an employee who stole pain medication from someone else."

142. Martel's comparison of legally prescribed, federally legal CBD use to theft of controlled substances demonstrates:

- A fundamental misunderstanding or willful mischaracterization of the law;

- Irrational and exaggerated reasoning applied to Plaintiff's conduct;

- Pretextual justification for a predetermined outcome; and

- Discriminatory animus.

143. On January 3, 2023, Martel issued a written decision sustaining all three charges and removing Plaintiff from federal service effective January 4, 2023.

**H. Damages Suffered by Plaintiff**

*Economic Damages*

144. At the time of his removal, Plaintiff was a GS-1895-12 Customs and Border Protection Officer earning approximately $95,000 per year in base salary.

145. Plaintiff was also entitled to federal benefits including health insurance, life insurance, retirement contributions (FERS), Thrift Savings Plan matching

17

contributions, leave accrual, and other valuable benefits.

146.   Plaintiff has been unemployed or underemployed since his removal on January 4, 2023.

147.   Plaintiff has lost approximately three years of salary, totaling approximately $285,000 in lost wages.

148.   Plaintiff has lost approximately $75,000 in lost federal benefits, including retirement contributions that would have vested and compounded over time.

149.   Plaintiff has lost the opportunity to advance in grade and rank within CBP, which would have resulted in higher lifetime earnings.

150.   Plaintiff's future earning capacity has been permanently damaged because the stigma of removal from federal law enforcement employment makes it extremely difficult to obtain comparable employment.

151.   Plaintiff has incurred costs seeking new employment, including resume services, job search expenses, and application fees.

152.   Plaintiff has suffered loss of retirement benefits and security, including reduced FERS annuity and lost years of service credit.

153.   Plaintiff's total economic damages exceed $360,000 and continue to accrue.

***Non-Economic Damages***

154.   The wrongful removal has caused Plaintiff severe emotional distress, including:

- o   Depression and anxiety;
- o   Loss of self-esteem and professional identity;
- o   Humiliation and embarrassment;
- o   Shame associated with being labeled a drug user when he never used illegal drugs;

18

- o Stress and anguish from financial insecurity;
- o Damage to his reputation in the law enforcement community; and
- o Ongoing mental anguish from the injustice of his removal.

155. Plaintiff dedicated twelve years of his life to serving his country as a federal law enforcement officer, and his wrongful removal has devastated him psychologically and emotionally.

156. Plaintiff's removal has damaged his relationship with his family, who have suffered financially and emotionally alongside him.

157. Plaintiff has suffered humiliation in his community, where he was known and respected as a CBP officer.

158. The stigma of being removed from federal law enforcement employment for allegedly testing positive for drugs has caused Plaintiff profound shame and reputational harm, despite the fact that he was using legally prescribed medication.

159. Plaintiff has been denied the dignity, respect, and professional standing he earned through twelve years of exemplary service.

160. Plaintiff continues to suffer ongoing emotional distress knowing that he was treated differently than non-African American male employees who engaged in the same or worse conduct.

161. Plaintiff's mental health has deteriorated significantly since his removal, requiring therapeutic intervention.

**FIRST CAUSE OF ACTION**

**RACE DISCRIMINATION (TITLE VII)**

**(Plaintiff Against All Defendants)**

162. Plaintiff incorporates by reference all preceding paragraphs.

163. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, prohibits discrimination in federal employment based on race.

164.   Plaintiff is an African American male and is a member of a protected class under Title VII.

165.   The Agency subjected Plaintiff to unlawful disparate treatment based on his race in violation of Title VII.

166.   Plaintiff was qualified for his position, having served successfully for twelve years with passing performance evaluations, awards, and commendations.

167.   The Agency removed Plaintiff from federal employment on January 4, 2023, an adverse employment action.

168.   Similarly situated employees who were not African American received substantially more favorable treatment for the same or similar conduct:

- M.B. (Central American female) tested positive for drugs, was removed, but was reinstated and remains employed;
- L.T. (Hispanic female) tested positive for THC with a prescription (like Plaintiff), but was not disciplined and remains employed; and
- Supervisor Auccsion (Filipino male) tested positive for methamphetamine and THC but was granted early retirement rather than removal.

169.   The Agency failed to follow mandatory split sample testing procedures for Plaintiff while following such procedures for other employees, demonstrating race-based disparate treatment in the drug testing process itself.

170.   The Agency's stated reasons for removing Plaintiff are pretextual, as evidenced by:

- The Agency's disparate treatment of similarly situated non-African American employees who tested positive for drugs;
- The Agency's reliance on a factually baseless third-party complaint contradicted by the Agency's own records and testimony;
- The Agency's failure to take any action on the November 2020

complaint for two years, demonstrating lack of genuine concern;

o The Agency's failure to discipline Supervisor Nguyen for ordering Plaintiff to drive without proper authorization;

o Director Martel's irrational characterization of prescribed CBD use as equivalent to theft of controlled substances;

o Acting Port Director Davies' demonstrably false testimony under oath regarding her knowledge of Plaintiff's prior EEO activity;

o The Agency's reliance on settled and extinguished discipline from 2014 in violation of the settlement agreement;

o The Agency's abandonment of Plaintiff at the LAWA hearing by failing to provide required representation; and

o The Agency's continued trust in Plaintiff to carry a firearm and perform duties for over a year after the alleged incidents, contradicting Martel's claimed loss of confidence.

171. Plaintiff's race was a motivating factor in the Agency's decision to remove him from federal employment.

172. The Agency's pattern of treating non-African American employees more favorably in drug testing cases, combined with the pretextual nature of the stated reasons for removal, gives rise to a strong inference of racial discrimination.

173. But for Plaintiff's race, the Agency would not have removed him from federal service.

174. As a direct and proximate result of the Agency's unlawful race discrimination, Plaintiff has suffered and continues to suffer severe economic and non-economic damages as alleged herein.

/ / /

/ / /

/ / /

21

## SECOND CAUSE OF ACTION

## SEX DISCRIMINATION - DISPARATE TREATMENT (TITLE VII)

### (Plaintiff Against All Defendants)

175.    Plaintiff incorporates by reference all preceding paragraphs.

176.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, prohibits discrimination in federal employment based on sex.

177.    Plaintiff is male and is a member of a protected class under Title VII.

178.    The Agency subjected Plaintiff to unlawful disparate treatment based on his sex in violation of Title VII.

179.    Similarly situated female employees received substantially more favorable treatment for the same conduct:

- o    M.B. (female) tested positive for drugs, was removed, but was reinstated and remains employed;

- o    L.T. (female) tested positive for THC and provided a prescription (identical to Plaintiff's situation), but the MRO accepted her medical explanation and she was not disciplined or removed.

180.    The Agency's acceptance of L.T.'s prescription as a valid medical explanation for her positive THC test while rejecting Plaintiff's prescription for the same purpose establishes sex-based disparate treatment.

181.    The Medical Review Officer Dr. Rahman followed standard split sample testing procedures for female employees but failed to offer such procedures to Plaintiff, demonstrating sex-based disparate treatment in the testing process itself.

182.    The Agency's pattern of treating female CBPOs who tested positive for drugs more favorably than Plaintiff demonstrates sex-based discrimination.

183.    Plaintiff's sex was a motivating factor in the Agency's decision to remove him from federal employment.

184.    But for Plaintiff's sex, the Agency would not have removed him from

federal service.

185. As a direct and proximate result of the Agency's unlawful sex discrimination, Plaintiff has suffered and continues to suffer severe economic and non-economic damages as alleged herein.

### THIRD CAUSE OF ACTION

### SEX DISCRIMINATION - HOSTILE WORK ENVIRONMENT (TITLE VII)

### (Plaintiff Against All Defendants)

186. Plaintiff incorporates by reference all preceding paragraphs.

187. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, prohibits sexual harassment and hostile work environment based on sex.

188. From approximately September 2017 through November 2018, Section Chief Anthony Owens subjected Plaintiff to severe and pervasive sexual harassment.

189. Owens sent Plaintiff numerous sexually inappropriate text messages over more than a year.

190. Owens explicitly demanded physical contact from Plaintiff ("you owe me a hug") as quid pro quo payment for the statement Owens had provided supporting Plaintiff's EEO complaint, constituting classic quid pro quo sexual harassment.

191. Owens was Plaintiff's superior in the CBP management hierarchy, creating a power imbalance.

192. The harassment was unwelcome and unwanted by Plaintiff.

193. The harassment was based on Plaintiff's sex (male) and was sexual in nature.

194. The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create an abusive work environment.

195. The harassment caused Plaintiff to fall into a depressive state for years.

196.   Plaintiff reasonably feared reporting the harassment because of his prior experience with retaliation from CBP management following his 2014-2016 EEO complaint.

197.   The Agency is liable for Owens' harassment under theories of:

- Supervisor liability (Owens was a Section Chief with authority over Plaintiff);
- Failure to maintain policies preventing sexual harassment;
- Failure to maintain a workplace where employees could safely report harassment without fear of retaliation; and
- Creating a culture of impunity for management misconduct.

198.   Owens' consciousness of guilt—demonstrated by his messages begging Plaintiff to delete the text exchanges—shows that Owens knew his conduct violated agency policy and professional standards.

199.   The Agency failed to take adequate steps to prevent, detect, or remedy the sexual harassment of Plaintiff.

200.   As a direct and proximate result of the Agency's failure to prevent and remedy the hostile work environment, Plaintiff suffered severe emotional distress, depression, and psychological harm.

**FOURTH CAUSE OF ACTION**

**RETALIATION (TITLE VII)**

**(Plaintiff Against All Defendants)**

201.   Plaintiff incorporates by reference all preceding paragraphs.

202.   Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, prohibits retaliation against federal employees for engaging in protected EEO activity.

203.   Plaintiff engaged in protected activity when he filed an EEO complaint in 2014-2015 challenging his suspension as discriminatory (EEOC Case No. 480-

24

2015-00783X).

204. The Agency had actual knowledge of Plaintiff's protected EEO activity, as evidenced by:

- The Agency being a party to the 2016 settlement agreement resolving Plaintiff's EEO complaint;

- Acting Port Director Davies' explicit reference to the 2014 suspension in her July 2020 proposal letter; and

- The inclusion of 2014 suspension documents in the agency file for the removal action despite the settlement agreement requiring their removal.

205. The Agency took a materially adverse employment action against Plaintiff by removing him from federal service on January 4, 2023.

206. There is a causal connection between Plaintiff's protected EEO activity and the adverse action, demonstrated by:

- The Agency's blatant violation of the 2016 settlement agreement by retaining, referencing, and relying upon the 2014 suspension that was contractually extinguished through Plaintiff's EEO settlement;

- Davies' inclusion of the 2014 suspension documents as "relevant and material" to the removal decision in direct violation of the settlement terms;

- Davies' demonstrably false testimony denying knowledge of the 2014 discipline, which she later admitted knowing about, demonstrating consciousness of wrongdoing and retaliatory intent;

- The Agency's suspicious delay in pursuing discipline for the November 2020 complaint, taking no action for over two years until it could be aggregated with other charges to support removal;

- The Agency's progressive discipline framework being tainted by

improper consideration of protected EEO activity; and

o   The temporal proximity between Plaintiff's exercise of EEO rights and the Agency's subsequent adverse treatment.

207.   Under the "cat's paw" theory of liability, Acting Port Director Davies performed acts motivated by retaliatory animus—including violations of the settlement agreement, improper reliance on extinguished discipline, and false testimony—that were intended to cause an adverse employment action and were a proximate cause of Director Martel's decision to remove Plaintiff.

208.   The Agency's reliance on discipline that was challenged through protected EEO activity, nullified by an EEO settlement agreement, and contractually required to be removed from Plaintiff's record constitutes retaliation per se.

209.   The Agency converted Plaintiff's protected EEO activity into an aggravating factor for removal, thereby penalizing him for having exercised his Title VII rights.

210.   The Agency's actions would dissuade a reasonable employee from engaging in protected EEO activity.

211.   Plaintiff's protected EEO activity was a motivating factor in the Agency's decision to remove him from federal employment.

212.   But for Plaintiff's protected EEO activity, the Agency would not have removed him from federal service.

213.   As a direct and proximate result of the Agency's unlawful retaliation, Plaintiff has suffered and continues to suffer severe economic and non-economic damages as alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Adam Pepper respectfully requests that this Court:

A. Assume jurisdiction over this action;

B. Declare that Defendant's actions violated Title VII of the Civil Rights Act

of 1964, as amended, 42 U.S.C. § 2000e et seq.;

    C. Award Plaintiff compensatory damages for:

- Lost wages and benefits from January 4, 2023 to present in the amount of approximately $360,000, and continuing to accrue;
- Future lost wages and diminished earning capacity;
- Emotional distress, mental anguish, humiliation, and psychological injury;
- Damage to professional reputation;
- Loss of retirement benefits and security;
- Other economic and non-economic harm;
- All such damages to be proven at trial;

    D. In the alternative or in addition, order Plaintiff's reinstatement to his position as a GS-1895-12 Customs and Border Protection Officer at Los Angeles International Airport with full seniority, benefits, and all rights and privileges;

    E. Award Plaintiff full back pay with interest from January 4, 2023 to the date of judgment or reinstatement, calculated in accordance with the Back Pay Act, 5 U.S.C. § 5596;

    F. Order expungement of the January 4, 2023 removal action and all related disciplinary documentation from Plaintiff's Official Personnel Folder and all agency records;

    G. Order the Agency to comply with the terms of the 2016 EEO settlement agreement by permanently removing all references to the 2014 suspension from Plaintiff's records;

    H. Award Plaintiff's reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

/ / /

/ / /

/ / /

I. Award Plaintiff pre-judgment and post-judgment interest as allowed by law;

J. Grant such other and further relief as the Court deems just and proper.

Dated: January 20, 2026          **IVIE McNEILL WYATT PURCELL & DIGGS**

By:    */s/ Rodney S. Diggs*
       **RODNEY S. DIGGS, ESQ.**
       Attorneys for Plaintiff,
       **ADAM PEPPER**

28

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable, including but not limited to the determination of liability and the amount of compensatory damages.

Dated: January 20, 2026          **IVIE McNEILL WYATT PURCELL & DIGGS**

                      By:    */s/ Rodney S. Diggs*
                             **RODNEY S. DIGGS, ESQ.**
                             Attorneys for Plaintiff,
                             **ADAM PEPPER**